The legal argument stems from the actions of the attorney that tried the case, not Mr. Sackman or his law firm. The attorney that firmly tried the case is famous or infamous. Its newsletter attacks the court in certain holdings, it attacks the commission, it attacks the act. It made the case of Holt Camp Trucking where it recommended a doctor not turn over subpoenaed records. It was filed June 24, 2010. What was strange about this case is that I had issued a subpoena to a respondent and they turned over the subpoena on the trial date, but left out five documents that may hurt them, not knowing what the petitioner had. In those five documents, the arbitrator admitted for the fifth one he rejected. The fifth one was an occupational release from the occupational doctor. So is that part of the record here? Yes, it's 155 of the record. The police says that I never argued it. Well, I argued it before the arbitrator. I got four of them into evidence. It was not turned over by the respondent, but it was turned over and authenticated by the petitioner. She had these documents. She was a level one trauma nurse, 20 plus years of service. Are we talking about Exhibit 10? Yes, sir. Exhibit 10, exactly. And that's where the occupational doctor on the stationery at St. James Hospital said, sitting position only, dated July 26, 2000. And that's the same day that her doctor, Malik, returned her to work after she had sneezed at home and had been on a 20-pound lifting restriction since the 1998 accident. She came back to work August 6. She worked 12-hour shifts. And on 10-28, 2000, she worked a 14-hour shift. They were short one nurse. She started at 7 a.m. She didn't work seven hours a day. She worked from 7 a.m. to 7 p.m. And on the 28th of October, 2000, she worked until 9.30 a.m. 9.30 p.m. And that was corroborated by herself, a co-worker nurse at that present time, Valerie Murray. She then made an appointment, went home after working, went home, made an appointment to see Dr. Malik at 11-1. She indicated she was demoted from a managing nurse, where she usually sat, to a staff nurse. And that required her to do a lot of lifting, twisting, bending. Why did the arbitrator reject your Exhibit 10? I have no idea. Well, as the record reflects, he rejected it because it wasn't contained within any doctor's records. It was authenticated by the petitioner. That was Dr. Malik's. It was not in Dr. Malik's record, but that was admitted. She had to bring a release from her own doctor, which is Exhibit 10A. Here, don't confuse things. Was it within the doctor's records or wasn't it? The Exhibit 10A, which was admitted, was not within Dr. Malik's records. We're talking about the one that was rejected. Exhibit 10 should have been returned. That was an exhibit that was created by the occupational medicine doctor for a respondent that said sitting only. He went further in restrictions to show how fragile her work was. Who authenticated the record? Pardon me? Who authenticated the record? Both the prior law firm and myself. You can't authenticate records. Doctors have to authenticate records. Somebody has to lay a foundation. Who laid the foundation? The petitioner laid the foundation because her boss, Janet Mirza, who was in the record, told her that she must, upon return, go to the occupational doctor to get a release from the occupational doctor. She did that on July 26th with the record, with the Dr. Malik's release, that was not in Dr. Malik's records. That was exhibit 10A, which was admitted. According to your own brief, the portion of the transcript that you attached, you claimed that it was authenticated by the petitioner as giving it, having been given to the occupational doctor. And your opponent says that doesn't authenticate it. It wasn't within the doctor's records. The arbitration sent says he agrees, and he rejected the exhibit. Now, I'm asking you, where's the foundation? The exhibit that may have been, the exhibit 10A was not, that was. Not 10A, 10. 10 was not, 10 was in, was a exhibit created by the occupational disease doctor responding. That may have been misstated, but 10 was, 10 is exhibit 155 of the record. Did you subpoena the record from the, from their doctor? I subpoenaed all workers' comp records involving her, both her cases. Five documents were not turned over. The arbitrator admitted four. Because she hadn't given the release. I understand all that. Right. I keep asking you the same question. Who authenticated 10? The petitioner authenticated all, authenticated 10, 10A, and all the other exhibits that were not. Does the petitioner lay a foundation for a doctor's record, or does it have to come from the doctor and be certified by the doctor? She was, she went to the occupational doctor, the doctor that was mandatory for her employment. She had to get a release from the doctor, which is exhibit 10. That's the occupational doctor. That's in the records of the respondent. That was rejected, and it was rejected as marked in my brief before the commission, before the court, as a rejected exhibit 10. There may have been a mistake as to 10 and 10A, and there was an arbitration. But 10 is the rejected exhibit and the only exhibit from their doctor that said she can do sitting work only, and they did not honor her restrictions. They let her do full shifts, 14 hours on the last day, and her back was fragile. And that is a, and they refused to turn them over, and then they objected to them at the same time. It's hard to, it's a very good trick on behalf of a respondent. Now, again, not this law firm, but the prior law firm to do that. I've never seen it. I've done both sides. That is a, it's unethical. It's an awful situation. And in all arguments, you can see in the record that the commissioner or commission panel said, where is this document? And that we're referring to what I, in that brief, to doctor, the occupational doctor that returned her to work. And that is critical, the most critical exhibit that was rejected and vigorously fought by the respondent's counsel at arbitration. And the arbitrator let four of them in, but the one that she said sitting only, he rejected that. And I argued that before the commission. Mr. Saxton was there. He may not realize it. He did not draft this brief. This brief was drafted by one of his associates who was not there at all. And on the manifest weight issue. So you're saying that you did argue that? I argued it all argument. I even put in the brief statement of exceptions to the commission that exhibit 10, the occupational release, was a rejected exhibit in my statement of facts to the commission. So you raised it before the commission? I argued that before the commission. I swear under oath that I did. And it's marked there. Is that exhibit, that rejected exhibit, in the record on appeal? Well, what happened was, is when the rejected exhibit was in the file, okay, it was not, for some reason it was in the file. But when they put the record together to go to the trial court, it was included in that record and also submitted up to this court as page 155 of our court record, this court's record. Counsel, based upon the record, the issue, is it not, is whether or not the commission's decision that your client's current condition of ill being was not causally related to the accident is against the manifest weight of the evidence. That is really the issue, correct? That's the manifest weight. But to get to that point, to properly get to that point, to leave out the evidence that she could do sitting work only by their own doctor, that is key and critical. Her doctor didn't go that far. He said 20 pounds of lifting, limited twisting and bending. She had an MRI done in July which showed three herniated discs. She had one disc in 1998. The MRIs were the same, but clinically she was different. She needed surgery, low back surgery finally, which she asked for because of the back pain, which was never authorized. And then she went to Dr. Slack, four years later, who took all the records. We took his deposition. All parties took the deposition. And he found causation. He had all the records before him. He found causation. Schirmer said there was no causal connection. The MRIs would indicate no worsening of the claimant's condition during the previous year, which covered October 28th, correct? Dr. Schirmer, in cross-examination, said that this was a major flare-up and that it could very well need surgery in cross-examination. He admitted that. So in weighing the evidence, how did the commission err? The commission basically rubber-stamped the arbitrator's decision. And the arbitrator totally rejected the exhibit of 10 and totally threw out the evidence of Dr. Slack. Just said it's meaningless, has no relevancy. So your argument stands and falls on the brief argument that they rubber-stamped the arbitrator. No, no. It goes on the fact that she was returned to work August 6th by the respondent's own doctor at sedentary work. And I argued that throughout. But it was a rejected exhibit. And the appellees are arguing it's not part of the record. It shouldn't be argued. And they say I waived that argument. I never waived that argument. Now, your client alleged she was in severe pain on October 22, 2000 while she was at work during an emergency room assignment. Wasn't there a co-worker who said that your client worked the whole day without any difficulty? She didn't recall your client ever complaining at all about anything? Valerie Murray worked from 7 a.m. to 7 p.m. She went home after a 12-hour shift. She worked side-by-side with the petitioner as her testimony. And she said the woman was not a complainer, the appellant was not a complainer. And she continued to work two and a half hours longer and left at 9 30. So how she felt after 9 30, she indicated she felt bad. She had to walk up to her car. She got in her car. Thank God it was two miles to get home. And then she made an appointment with Dr. Malik. She called the nurse, Sue Rogers, that night and said, I won't make it in. My back is hurting. Valerie Murray, a co-worker, who called Valerie Murray as a witness? Wasn't she one of your witnesses? Yes. Did she help your case? Yes. She corroborated the physical work that a level one trauma nurse had to do. And that she worked with her side-by-side on 10 28. And the petitioner testified also what she had to do. The job description is in the record. It also tells what she had to do. There was 13 cubicles in there, in that level one trauma unit. And she was on her feet. And her back was fragile. And her superiors told her, you can do the work, knowing. And she gave them the records. Here's the restrictions. You can do the work of a staff nurse. And she did it. And she paid for it. She didn't have to go to work after she sneezed. She could have said, I'm not coming back to work. She was returned to work August 6 and worked. And she didn't ask for late duty. The respondent's doctor gave her sitting-only work. They never gave it to her. Did the sneezing incident, in your opinion, have anything to do with her condition? It would. Per Dr. Schirmer and Dr. Slack, it was a flare-up. She had a level four pain before. It was the worst pain she had. It subsided to level four. She went back to work. If she hadn't gone back to work, I'd say, end of case. But she came back to work. Who comes back to work after sneezing and works 12-hour shifts Friday, Saturday, and Sunday, basically? That's what she worked. She did that. And she's penalized for it. And then they say they had no notice of it. There's another exhibit that didn't turn over, dated January 3 of 2001, where she said, I had two accidents. There was another exhibit not turned over, but she gave it to him. It was on St. James Stationery. And it was dated 1-3 to Eva Torres. I had a back injury in April of 98, and then again on 10-28, re-injured 10-28-00. They say their only notice was June of 01, when I called and said, where are your attorneys? That was the first notice that their risk manager testified to as their witness. And it was unbelievable. And that, again, was not turned over, but it was provided by the petitioner to show notice, et cetera. And it's just a pattern by Respondent's Counsel of not turning over relevant documents that they did not know the petitioner had. You barely couldn't convince Molly Mason or Mr. Rink with respect to your position. It was Mr. Rink's case, and the arbitrator, for some reason, and I can't answer why he would let four documents in and not the fifth one, all provided and authenticated by the petitioner, and not turned over on a properly served subpoena by the Respondent, and then objected to by the Respondent, all five of them, and then one he leaves out. And they look for that document, and that document for sitting only is not part of the evidence that they looked at. And they indicate, and there's handwriting on my brief or whatever that's part of the record that says, where is this document? Well, the arbitrator put it in the file, but it was bound in the record. But it wasn't, for some reason, they didn't look at the rejected exhibit in the file. Did you? Did you look at it? I saw it, yes. And I argued. I knew it was there. It was provided by the petitioner. And that's why I called it in my statement of exceptions, as I said before, that it was a rejected exhibit.  Your time is up, counsel. We have time for rebuttal. Can I save one minute?  We have time for rebuttal. Thank you. May it please the Court. Mr. Galesburg. My name is Jeremy Stockman, and I'm here today arguing on behalf of the Appellee St. James Hospital. Mr. Galesburg has argued in front of you that the Commission made a mistake, that his claim should have been found compensable. But, of course, that's not the standard of review here. He hasn't argued the only issue that really is in front of this Court, which is, did the Commission make such a mistake that their decision should be found contrary to the manifest way to the evidence? And clearly, he hasn't made that argument. Counsel, what do you make of his not-too-thinly-veiled argument that trial counsel for the respondent improperly held back documents? Well, if he actually had that argument, and if he actually believed that argument, he had a procedure that he could have followed to pursue that argument. He could have asked for a continuance at the time of the trial, because he was not given full access or was not given full release of the records that he claims were subpoenaed. He could have then filed a motion in circuit court to enforce his subpoena. If they did not produce the documents as he alleges were available, then he could have got a rule to show cause. So he had every opportunity in the world to remedy what he believes was an inappropriate response to the subpoena. He did nothing. And in fact, to follow up on that very issue, I wasn't going to spend much time with it. He's waived this argument. You can look at his statement of exceptions, and what you will see is a factual summary indicating that this exhibit was a rejected exhibit. But you won't see one argument, not one argument, in the statement of exceptions that was filed with the Industrial Commission, suggesting that the Industrial Commission made an error when they, or that the arbitrator made an error. In other words, there were no evidentiary issues that were preserved by his statement of exceptions. He didn't argue in front of the Commission that it was an abuse of discretion. The first time he argued that was in front of the circuit court. So he has waived that argument. He's waived it orally, and he waived it by his brief and by the request for review that he filed in front of the Commission. That argument's not here anymore, and for him to have argued in his brief, as he did repeatedly, and to have argued in front of you today from a rejected exhibit is inappropriate. So getting back to the issue that really is in front of us today, that is, is this decision from the Industrial Commission contrary to the manifest weight of the evidence? Well, the first question is, what does it mean to be contrary to the manifest weight of the evidence? And the test that I've always liked is the scintilla rule. In other words, if there's a scintilla of evidence to support the Industrial Commission's decision, that decision cannot be reversed. Where did you get that authority, a scintilla? That's an old case. It must be an old case. It is, believe me. I think it's the manifest weight of the evidence test, is it not, today? Pardon?  No, that's what I'm saying. To comply with the manifest weight of the evidence, if there is a scintilla of evidence that the Commission could have relied upon, then their decision is not contrary to the manifest weight of the evidence. Well, you're using the word scintilla, which kind of says this case doesn't have much more than a scintilla. I mean, aren't you really the way we talk about it now? Is there evidence in the record? Yes, absolutely. Let me get to what the evidence is. And let's go to that evidence. That's right. You're quantifying it probably in a very negative, unfavorable light to you. And minimizing it. Well, what I'm saying is there doesn't have to be a preponderance of the evidence for the Commission to find the way that they did. There only has to be some evidence. Are you asking us to overrule it? No, I'm not asking you to overrule it. Sounds to me like you are. No, no, no. I'm saying that there is sufficient evidence in this record to support the Industrial Commission's decision and that their decision should be affirmed. And let me tell you what the evidence is. First of all, this individual had an injury in 1998. That was tried, actually, at the same time as this one. The arbitrator found that the petitioner proved an injury in 1998 and awarded the petitioner 10% loss of a person. Well, back in 1998, there also was an MRI. The MRI showed a herniated disc at L5-S1. Back in 1998, the petitioner was given restrictions. Those restrictions were permanent. 20 pounds lifting restrictions. Back in 1998, and for every point thereafter, the petitioner said she was in constant pain. Four on a scale of 10 at all points in time. Well, her condition was not static. In 1999, she had a flare-up of her condition, had to go back to see her treating doctor, Dr. Malik, and in November of 1999, Dr. Malik already was suggesting to her that she may need surgery. In June of 2000, again, before our entry, the petitioner had a significant aggravation of her condition. She had a significant flare-up. Her pain, she said, was more severe than it had ever been before. It was pain that brought her to tears. What caused this pain? She was sitting in a chair at home and sneezed. That's the condition that she had at that point. She received Vicodin. She received epidural injections. She had yet another MRI in July of 2000, and that MRI showed her condition had worsened. She now had two herniated discs. She was returned to work. Her work was that of basically a part-time employee. The records reflect that in the two weeks prior to this alleged injury of October 2000, she only worked 38.5 hours in two weeks. The records show that she complained of pain on October 28, 2000, yet the records also show she never completed an accident report. She never reported this accident or increase in pain to her supervisor, and she says she called in the next day, spoke to the charge nurse, and what she told that charge nurse was, I have back pain. I won't be in today. She never said, I have back pain the result of anything that I did at work. She was seen by Dr. Malik, her treating physician, three days after this alleged injury. That's on November 1 of 2000. She tells Dr. Malik that her job required her to do some bending, lifting, twisting at work. She had to work as long as 12-hour shifts. She said her pain had come to a point where it is really the central theme in her life. It's interfering with her activities both at work and at home. That's not telling the doctor about an accident. That's telling the doctor about a preexisting condition that had gotten to the point that it was interfering with her activities of daily living. It was interfering with her work, but she never said, my work caused this. And that's one of the things that the arbitrator pointed out. The arbitrator also looked at all of this evidence, this evidence of the preexisting condition, and found that based upon his review of everything, there really was no change. The only MRI that was done after our alleged injury was done in July of 2001. That MRI was the same as the MRI done in July of 2000 before our injury. There's no change. So the arbitrator concluded, based on the facts, there was no evidence of any change in the underlying condition as a result of the alleged activities of October 28. Now that in and of itself would be sufficient to confirm the Commission's decision. They also went on and said that the petitioner failed to produce evidence of a repetitive activity. The petitioner testified that her job was varied. She did standard patient care. She did charting. She did work schedules. She did evaluations. She dealt with families. She dealt with doctors. There was some general testimony that her job required lifting, twisting, bending. But there was no testimony from her or anybody else that she did those activities on the date of the injury or on the week before the injury. There's simply a failure of proof here. And as one of the judges pointed out, she worked all day with a co-worker and never complained to that co-worker of any problems while doing the work that she was doing. The Commission's decision is not contrary to the manifest weight of the evidence. Which means an opposite conclusion is not clearly apparent. That is correct. Nothing to do with scintillas. We don't need to go there, right? Okay. You're absolutely right. Thank you. Thank you, counsel. Thank you. Roberto. The only thing I could say is that as justices hear all these cases, that the fact that the MRI was the same a year later, clinically, with the complaints of pain, this is the first time on 11-1-2000, three days after, that this nurse claimant request surgery. And Dr. Malik indicated that if she didn't have surgery then, it would lead to a more complex fusion. The argument that the MRIs were the same, it's up to the neurosurgeon, which Malik was. Dr. Malik was a worsening condition. And again, the woman was not someone who complains. She also, as cases show, had a prior specific injury. This was repetitive trauma. How is she supposed to know to report a specific trauma when she had constant lifting and a back that went out? But she did call her nurse. She filled out a report 1301 and indicated a re-injury to her back. Counsel, just so we don't leave one issue hanging in the air, you initially spent a great deal of time arguing that the arbitrator erred in striking Exhibit 10. Did you raise and present that argument to the commission? In my brief, I put that Exhibit 10, the respondent's doctor exhibit, was rejected. I argued it orally before the commission. And they did not answer it at all. Did you ask them to? Pardon me? Did you ask them? I didn't put a special interrogatory in. I did not do that. And counsel brought up that I could have sought enforcement. Why would I need enforcement if the petitioner had the five documents that were critical to prove her case? They presented everything but those five exhibits. And enforcement, as I find later, on January 24th, 2010, they told a Dr. Fletcher, don't honor a subpoena. They gave me certain records, but they didn't give me the five critical documents the petitioner had. And I can't explain why the arbitrator would admit for and reject the response to Exhibit 10. I can't answer that, and I can't answer why the commission. But you are aware of the fact that matters not raised before the commission are waived on appeal. You are aware. Like I said, Mr. Sagan was there. I orally argued it. Just a minute. Just to be specific. You mentioned it in your facts, in your statement of exceptions, but you didn't raise it as an error to be reviewed before the commission. I raised it orally as an error, orally, before the commission. And in my brief to the commission, I said Exhibit 10 was a rejected exhibit. And I said, why is this rejected? Well, in your brief, did you set up, these are the errors that I want you to review, and what, in your brief, was one of those errors, rejecting that exhibit? I don't believe I did that. All right. But I did orally argue it. And Mr. Sagan argued it at the same time. I can't tell you that I argued it on paper. I argued it orally, but I indicated that the exhibit was rejected. Thank you. The Court will take the matter under advisement.